ORIGINAL

FILED
U.S. DISTRICT COURT
NORTHERN DIST. OF TX
FT. WORTH DIVISION

### IN THE UNITED STATES DISTRICT COURT FOR THE
### NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

2012 MAR 30   PM 4: 30

CLERK OF COURT

| | | |
|---|---|---|
| COLTON J. READ AND JESSICA G. READ, | § § § | |
| **Plaintiffs,** | § § | |
| VS. | § § § | CIVIL ACTION NO. |
| | § | 4 §-  -  191 A |
| UNITED STATES OF AMERICA, | § § | |
| **Defendant,** | § | |

### PLAINTIFFS' ORIGINAL COMPLAINT

**TO THE HONORABLE JUDGE OF SAID COURT:**

COME NOW, Plaintiffs Colton J. Read and Jessica G. Read (collectively the "Plaintiffs") and file this their Plaintiffs' Original Complaint against Defendant United States of America (the "Defendant United States") in the above numbered and entitled civil action (the "civil action" or "case"), and would respectfully show the Court as follows:

### I. INTRODUCTION

**A.      SUMMARY OF ACTION**

1.      This is a civil action brought by the Plaintiffs Colton J. Read and Jessica G. Read against Defendant United States of America (the "United States") for personal injuries, damages, interest, court costs, and general relief under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346, 2671-2680. In this complaint, the Plaintiffs seek damages from Defendant United States, by and through its agency, the United States Air Force ("USAF"), arising from a laparoscopic cholecystectomy surgical procedure initiated and converted to an emergent exploratory laparotomy through a mid-line abdominal incision performed on 20 - year old Airman First Class Colton Read by United States Air Force ("USAF") physicians and/or health care providers who punctured, or lacerated, and/or surgically injured and/or failed

to repair or bring about repair of Colton Read's descending abdominal aorta in a timely, proper, and adequate manner, resulting in significant internal bleeding, loss of blood supply and/or adequate blood supply to his lower extremities, and eventual above-the-knee and mid-thigh amputations of his right and left legs. In this civil action, Plaintiffs assert their claims in keeping with the spirit of George Washington's proclamation that "[W]hen we assumed the soldier, we did not lay aside the citizen."

**B.  PARTIES**

2.  **Plaintiff Colton J. Read ("Colton Read")** is an individual and citizen of the State of Texas.

3.  **Plaintiff Jessica G. Read ("Jessica Read")** is an individual and citizen of the State of Texas.

4.  **Defendant United States of America (the "United States")** may be served by delivering a copy of the summons and complaint to the United States Attorney for the Northern District of Texas at 801 Cherry Street, Suite 1700, Fort Worth, Texas 76102; and by sending a copy of the summons and of the Plaintiffs' Original Complaint by registered or certified mail to the Attorney General of the United States, Eric H. Holder, Jr., 950 Pennsylvania Avenue, NW, Washington DC, 20530-0001; and by also sending a copy of the summons and Plaintiffs Original Complaint by registered or certified mail to the officer or agency whose action is attacked in this suit but who is not made a party to this suit in accordance with Fed. R. Civ. P. 4(i)(1).

**C.  JURISDICTION AND VENUE**

5.  The Court has jurisdiction over the subject matter of this civil action under the Federal Tort Claims Act ("FTCA") 28 U.S.C. § 1346 (b) because this action involves a claim by the Plaintiffs against the Defendant United States for personal injury caused by the negligent and/or wrongful acts and/or omissions of federal government officers or employees while acting within the scope of their offices and/or employment.

6.      Venue is proper in this judicial district under 28 U.S.C. § 1402 (b) because the Plaintiffs Colton Read and Jessica Read reside in this judicial district.[1]

**D.    CONDITIONS PRECEDENT**

7.      Plaintiffs Colton Read and Jessica Read, by and through their attorneys, timely presented this claim in writing to the Defendant United States, through the United States Air Force ("USAF") in accordance with the Federal Tort Claims Act, 28 U.S.C. §§ 2401(b), 2675(a).  Defendant United States denied the Plaintiffs' claim; and this civil action is filed within six (6) months of the Defendant United States' final written notice of its denial of the claim.

## II. FACTUAL BACKGROUND

**A.    IMPROPERLY PERFORMED LAPAROSCOPIC GALLBLADDER SURGERY ON AIRMAN READ RESULTING IN AORTIC INJURY AND LACK OF BLOOD SUPPLY TO HIS LEGS**

8.      On or about the morning of July 9, 2009, Airman Colton Read,[2] accompanied by his wife, Jessica Read, traveled from Beale Air Force Base, California, to the David Grant Medical Center ("DGMC") located at 60 Medical Group (AMC), 101 Bodin Circle, Travis Air Force Base, California ("Travis AFB"), where Airman Read was admitted to DGMC as a patient for a laparoscopic cholecystectomy surgical procedure, also commonly known as, laparoscopic gallbladder surgery, to be performed on that date.  As of June-August 2009, DGMC was the United States Air Force's ("USAF") largest inpatient medical facility on the West Coast of the United States, the largest inpatient military

---

[1]   *See* 28 U.S.C. § 1402 (b) ("Any civil action or a tort claim against the United States under subsection (b) of section 1346 of this title...may be prosecuted only in the judicial district where the plaintiff resides or wherein the act or omission complained of occurred").

[2]   Plaintiff Colton Read was 19 years old when he enlisted in the United States Air Force on or about July 7, 2007. After completing his basic training at Lackland Air Force Base, Texas, he received further training at Goodfellow Air Force Base, Texas from on or about September 1, 2007 to March 23, 2008. Airman Read was assigned to duty and transferred to Beale Air Force Base, California ("Beale AFB") on or about April 2008, where he served as an Airman First Class and where he performed duties and responsibilities of an imagery analyst.

treatment facility of the Air Mobile Command ("AMC"), the second largest such facility in the USAF, and included several other major features.[3]

9.      At material times involved in this civil action and the present, the United States Air Force was and is an agency of the Defendant United States; and the Defendant United States, by and through its agency, the USAF, owned, operated, and controlled the above-mentioned DGMC health care institution and facilities at Travis AFB, and by and through its agency, the USAF, staffed the DGMC with its employees, agents, and servants, including physicians, nurses, and other health care providers.

10.     After admission to the DGMC, Airman Read received preoperative care including administration of drugs in preparation for his laparoscopic gallbladder surgical procedure. At approximately 8:40 a.m. on or about July 9, 2009, Airman Read was taken to a DGMC operating room ("OR") where he was placed under general anesthesia and rendered unconscious and insensitive to pain for the laparoscopic gallbladder procedure. The operating team consisted of USAF Major Kullada O. Pichakron, M.D. ("Dr. Pichakron"), a general surgeon, Captain Ryan J. Schutter, M.D. ("Dr. Schutter"), a first-year postgraduate general surgery resident, as well as a physician anesthesiologist, nurses, and other health care providers. With laparoscopic cholecystectomy under the applicable standards of reasonable and prudent medical and surgical care and technique, Airman Read's gallbladder was to be surgically

---

[3] As of June-August 2009, the DGMC served approximately 85,000 military beneficiaries throughout eight western states; as a Joint Commission on Healthcare Organization Accreditation ("JCHOA") accredited teaching hospital, the DGMC provides postgraduate training programs in family medicine, radiology, surgery transitional year, dentistry, oral surgery nurse anesthesia, pharmacy, and social work, as well as training for technicians and clinical nurses; the DGMC provided or arranged for comprehensive community and referral medical and health care, readiness, education, research, teleradiology services, aeromedical staging and Department of Defense/Veterans Affairs joint ventures; the DGMC encompassed over 808,475 net square feet with approximately 3,662 rooms; the DGMC operated with an annual budget of approximately $119 million and was staffed by nearly 2,500 personnel, which included almost 600 active duty officers, over 1,000 enlisted personnel, nearly 70 Individual Mobilization Augmentee reservists, over 260 Civil Service Civilians, nearly 350 contractors, over 70 red Cross workers and 160 dedicated military retiree volunteers; the DGMC was described by the USAF as a "state-of-the-art" medical center in 1988 at a cost of $193 million; the DGMC is over 808,475 square feet with 3,662 rooms; and it was staffed to operate 84 inpatient beds (expandable to 176) and 16 aeromedical staging flight beds (expandable to 40); DGMC was divided into 3 separate patient zones composed of inpatient nursing units, diagnostic and treatment areas, and outpatient clinics all designed around 5 large courtyards, which provide orientation for staff and patients, as well as natural lighting and views for patient rooms.

---

removed by instruments through tubes that were to be inserted through small incisions or portals (ports) in his abdominal wall. These incisions and portals were to be made by use of surgical trocar device(s) and system(s) and/or Verres needle(s) instruments. The entire procedure was to be performed on Airman Read with the assistance of a camera called a "laparoscope," that also was intended to be placed in his abdomen through the incisions or ports. [4]

      **11.**    In the laparscopic cholecystectomy procedure which began at or about 9:24 a.m., Dr. Pichakron was the operating surgeon, and, unbeknownst to Airman Read, she was assisted in the surgery by Dr. Schutter, a first-year postgraduate general surgery resident in training to become a general surgeon. During this laparscopic cholecystectomy procedure, the following events occurred:

    a.    Under Dr. Pichakron's supervision, the surgical resident, Dr. Schutter, started the procedure by making an incision just below Colton Read's umbilicus and inserting the first surgical trocar port into his abdomen in an improper manner which resulted in the trocar's traumatic puncture, laceration, or injury to the lower section of Airman Read's aorta just above the point where his aorta divided into the two iliac arteries that supplied blood to his legs. This aortic puncture, laceration, or injury was about 9 to 11 millimeters (mm) in length, and it caused massive bleeding in Airman Read's retroperitoneal area, a condition also referred to as a "retroperitoneal hematoma." However, Dr. Pichakron and Dr. Schutter did not recognize this traumatic injury to Airman Read's aorta until later in the surgery. At that point, as Dr. Pichakron observed Dr. Schutter's insertion of the trocar, she became concerned about how quickly the trocar went into Colton Read's abdomen, the amount of pressure that Dr. Schutter had used when inserting the trocar; and with the placement of the trocar, there was noted to be some arterial bleeding. Dr. Pichakron intervened and directed Dr. Schutter to stop inserting the trocar. At that point, however, Dr. Schutter had already punctured, lacerated, or otherwise injured Colton Read's aorta with the trocar. Dr. Pichakron took over performing the surgery on Colton Read. She removed the trocar obturator, inflated Airman Read's abdomen with carbon dioxide gas, put a camera through the surgical port and looked inside his abdominal cavity. While Dr. Pichakron and Dr. Schutter indicated that they saw some blood in Airman Read's abdominal cavity, they did not notice any arterial bleeding. Initially, both Dr. Pichakron and Dr. Schutter indicated that they saw no large or sustained accumulation of blood,

---

[4] Laparoscopic cholecystectomy was initially introduced as a form of gallbladder surgery in the United States in 1990 and in a very brief time it revolutionized surgical gallbladder removal practice among general surgeons. As of 2009, approximately 90 percent of cholecystectomies (gallbladder surgeries) were performed laparoscopically. Laparoscopic cholecystectomy as of 2009 had lessened postoperative discomfort, shortened the hospital stay, and reduced sick leave of patients undergoing the operation.

they assumed the bleeding was from a source somewhere in the connective tissue that attached Airman Read's intestine to his abdominal wall which also contained the blood and lymphatic system. Dr. Pichakron placed three more surgical ports under Colton Read's right rib cage for surgical instruments and she placed another port for instrument access to assist her in looking for the bleeding source. Dr. Pichakron looked in Airman Read's abdomen for several minutes, but she could not find a specific source of bleeding. While Dr. Pichakron was looking into Airman Read's abdomen for the bleeding source, the anesthesia team noticed the appearance of inconsistent readings on the non-invasive blood pressure cuff providing vital signs which they believed to be a mechanical malfunction. The anesthesia team evaluated connections and replaced the blood pressure cuff that appeared to be malfunctioning. After applying a replacement blood pressure cuff, the anesthesia team was still unable to get Colton Read's blood pressure readings at or about 9:40 a.m., and a member of the team noticed that Airman Read's body appeared to be turning pale in color. Dr. Pichakron was notified by the anesthesia team about Airman Read's blood pressure problem and they discussed giving him a constrictive medication to raise his blood pressure.

b. At or about 9:43 a.m., Dr. Pichakron converted the laparoscopic gallbladder surgery to an open "exploratory laparotomy" surgery with a large incision in Colton Read's abdomen to continue looking inside his abdominal cavity for the bleeding source. A call was also made for additional surgeons and anesthesiologists to assist in Airman Read's surgery. While Dr. Pichakron was looking inside Airman Read's abdominal cavity during the exploratory laparotomy, she recognized a large contained collection of blood in the back of Airman Read's abdominal cavity behind his abdominal organs, and she assessed an injury to his artery or vein consisted of a "retroperitoneal hematoma." Dr. Pichakron found the retroperitoneal hematoma extended from just below the point where Airman Read's arteries branched off from his aorta to his kidneys down to his aortic bifurcation. She also found that the retroperitoneal hematoma looked like a blood-filled balloon that was about 5 to 7 inches in length and 3 to 5 inches wide. Shortly thereafter, Dr. Pichakron surgically entered into the retroperitoneal hematoma to locate the specific site of bleeding and saw a large amount of bleeding. However, Dr. Pichakron did not locate the exact site of the bleeding. About 2500 cubic centimeters (cc) of blood was suctioned from Airman Read's abdomen during this time of the surgery. Eventually, Dr. Pichakron got manual control of Colton Read's bleeding by putting direct pressure on the bleeding area and the anesthesia team administered intravenous (IV) fluids and blood products to Airman Read. She also tried to control Airman Read's bleeding by attempting to put a vascular clamp above his aortic injury to stop the bleeding and allow her to see the extent of the injury so it could be repaired. Her first attempt at placing a clamp on the upper portion of his aorta was unsuccessful, and she successfully put a clamp on his aorta in her second attempt. This clamping significantly reduced the bleeding. Next, Dr. Pichakron saw and found that the source of Colton Read's bleeding was a 9 to 11mm laceration to his "distal aorta" just above the aortic bifurcation, and she put a clamp on the "middle section" of his aorta to control his bleeding.

     c.    Following this aortic clamping, Dr. Pichakron then tried to repair Colton Read's aortic laceration injury with sutures. According to Dr. Pichakron's written operation report, the "injury was debrided and repaired using a 3-0 Prolene suture closing the arteriotomy transversely in an interrupted fashion," and her written transfer summary states that Airman Read's aortic injury was "repaired primarily with a 3-0 interrupted Prolene suture." After putting in the sutures, Dr. Pichakron's operative report and sworn statement states that at or about 10:42 a.m., she removed the aortic clamps to test her attempted repair of Airman Read's aortic injury, saw "a little bit of continued bleeding and additional Prolene sutures were placed." Actually, Dr. Pichakron had departed from applicable standards of medical care by attempting to repair Colton Read's aortic injury in that she failed to timely, properly, and adequately repair his aortic injury in a manner which resulted in a loss or significant reduction of adequate blood supply to his right and left legs. During Dr. Pinchekron's attempt to repair Airman Read's aortic injury, the anesthesia team worked to resuscitate him and maintain his vital signs. And although Dr. Pichakron indicated that she assessed measurable blood flow with a pulse in both common iliac arteries that took blood to Airman Read's right and left legs, one or more anesthesia team or operative team members assessed that he did not have adequate blood flow to his legs. While Dr. Pichakron was out of the operating room visiting with Colton Read's wife, Jessica Read, the anesthesia or operative team performed pulse exams on his lower extremities and assessed that his toes were white, pulses in his feet could not be felt, Doppler ultrasound attempts to find pulses in his feet were unsuccessful and his feet were very cold to touch. Other members of the operating and/or anesthesia team evaluated and assessed that the blood flow to his legs was either absent, inadequate, or less than optimal. These concerns about the absent or inadequate blood flow to Airman Read's lower extremities were conveyed to Dr. Pichakron, but she either denied being told about the possible change in the pulse exams of his lower extremities or she assessed that his blood flow problems were due to his loss of blood and the medication used to maintain his blood pressure during the surgery. Dr. Pichakron then examined Airman Read's abdominal area, assessed he had no other injuries, irrigated and drained his abdomen, placed topical anti-bleeding agents on the area where she attempted to repair his aortic injury, packed his abdomen with gauze and the large abdominal incision was not closed with sutures since a vacuum dressing was used to temporarily close his abdomen that would allow later surgical re-entry of his abdominal cavity without having to make another large incision. At the end of the surgery, Colton Read had lost an estimated 3500 cc's or 3.5 liters of blood, but he was assessed as stable due to the anesthesia team's resuscitation efforts. Colton Read's gallbladder was not removed during this surgery. The surgery on Colton Read ended at or about 11:07 a.m.

    12.    Postoperatively, Colton Read was transported in critical condition to the Intensive Care Unit ("ICU") for additional resuscitation and observation. While Airman Read was in the ICU, Dr. Pichakron planned to continue resuscitation and further treatment until he had stabilized from the blood

loss, shock, and the surgery.   It was Dr. Pichakron's assessment and belief that any further surgery such as removing his gallbladder or closing his abdomen would cause unnecessary delay and potential complicate his resuscitation.   Dr. Pichakron also planned to allow an adequate period of observation and once Airman Read was stable, she intended to take him back to the operating room for a second look at his abdomen to check the aortic repair she believed that she had performed, remove his gallbladder, and suture his abdomen closed.

13.     As time progressed with Colton Read in the ICU, the condition of his lower extremities did not improve and the ischemic condition of his right and left legs worsened.   Assessments by his physicians, nurses, and other health care providers of his legs continued to deteriorate from pale to mottled as time passed.   An ultrasound study was performed on Airman Read in the ICU at or about 12:15 p.m. and it revealed abnormal non-pulsing blood flow in both of his legs.   At that time, a decision was made to further investigate the cause of this condition in Airman Read's legs using an angiogram which was a special x-ray test that used dye injected through the arterial system to show the anatomy of that system.   Airman Read was transported from the ICU to the Interventional Radiology ("IR") area for an angiogram study that began at or about 1:35 p.m.   During the angiogram in the IR area, a DGMC medical staff cardiothoracic surgeon (the "CT surgeon") arrived in the IR area to assist with Airman Read's care, where he was informed about Airman Read's lower extremities ischemic condition and he had discussions with an interventional radiologist, Ezall Askew, M.D., and Dr. Pichakron concerning Airman Read's aortic injury, Dr. Pichakron's belief that she had repaired the injury, the interpretation of the femoral angiogram study performed, and whether they should transfer Airman Read to University of California – Davis Medical Center ("UCDMC") in Sacramento, California, to ascertain the specific cause of his decreased blood flow and perfusion to his lower extremities.   These physicians discussed whether Airman Read's lower extremities ischemia was due to a blood clot versus dissection of his right and/or left femoral arteries.   Dr. Pichakron, the CT surgeon, and Dr. Askew, and perhaps other physicians, decided to continue to treat

Airman Read at the DGMC. Based on the results of the angiogram, Dr. Eskew conveyed to Dr. Pichakron that he could not offer a stent or TPA for Airman Read and that he probably needed the services of a vascular surgeon. It was eventually determined by Dr. Pichakron that a vascular surgeon was required to address the complications identified at and below the site of Airman Read's aortic injury and perceived surgical repair. At or about 2:30 p.m., a decision was made by Dr. Pichakron to transport Airman Read to the UCDMC for further medical diagnosis, assessment, care, and treatment by a vascular surgeon. Administrative steps were initiated to transfer Airman Read to UCDMC as the Interventional Radiology staff prepared him for transport back to the ICU.

**B.     TRANSFER OF AIRMAN READ TO UCDMC AND AMPUTATION OF HIS LEGS**

**14.**     At or about 3:10 p.m. on July 9, 2009, a Reach Air Ambulance (RAA) helicopter was arranged to transport Colton Read to the UCDMC in Sacramento, California after both a receiving physician had been confirmed and a bed secured for Airman Read at UCDMC. The Reach Air Ambulance helicopter arrived and landed at Travis AFB at or about 3:36 p.m. The RAA transport crew arrived in the DGMC ICU at or about 3:50, and the transport crew and ICU staff proceeded to prepare and transfer Airman Read to the helicopter medical support equipment. Airman Read was taken out of the ICU at or about 4:43 p.m., transported to the RAA helicopter and the helicopter was airborne and heading to UCDMC at or about 5:01 p.m.

**15.**     At or about 5:17 p.m., the RAA helicopter with Colton Read aboard arrived at the UCDMC in Sacramento, California. On arrival in the UCDMC ICU, Airman Read was assessed as hemodynamically stable, but found to have no pulses at the femoral arteries or distally in his lower extremities. He was intubated and sedated and a detailed motor and sensory was not possible, but it was medically assessed that he had rigor of his right leg and his right knee could not be bent. He was also assessed with rigor of the left calf, with inability to bend his left ankle. Airman Read's lower extremities were pale and cool with no obtainable Doppler signals of any pulses. He was found to have an open

abdomen with a vacuum dressing in place.  A medical assessment was made that Airman Read had severe lower extremity ischemia, and a review of the radiology imaging studies that were forwarded with him suggested aortic occlusion at the level of his aortic injury.  Colton Read was taken to an operating room where he was managed with general anesthesia and he had previously been intubated.  On surgical exploration by David L. Dawson, M.D., a vascular surgeon, there was approximately 500 ml of clotted blood in his pelvis and abdomen.   There was no active bleeding, and his stomach was distended.   A defect was observed in the mesentery of the ileum suggestive of a site where a surgical instrument or trocar had been passed; and several puncture wounds on the lateral abdomen consistent with iatrogenic wounds were also found.  The large intestine was found to be normal and there was some hemorrhagic staining of the omentum.   Retroperitoneal hematoma and ecchymotic discoloration was found at the base of the mesentery.  Airman Read's aorta had been exposed in the retroperitoneum below the renal arteries, evidence of prior supraceliac crossclamping was noted, and there were multiple large Prolene sutures in the distal portion of his abdominal aorta just proximal to the aortic bifurcation.  Airman Read's aorta was found to be pulsatile above that level and non-pulsatile below that level.  After gaining vascular control and opening the aorta by removing the previously placed sutures, Dr. Dawson encountered a plug of thrombus that was completely occluding the aorta.  Dr. Dawson removed the thrombus and his inspection of the inner lumen of the aorta showed that there was a disruption of the intima of the posterior wall and subintimal staining, and there did not appear to be an elevated intimal flap or dissection.  Intraoperative assessment found aortic occlusion and distal limb artery thrombosis in Airman Read; and surgical exploration of the muscle compartments of his legs revealed evidence of severe ischemia.    A thrombectomy of the femoral, popliteal, and infrapopliteal arteries, along with four compartment fasciotomies, were performed on Airman Read's left leg. With the medical determination that Airman Read's right leg was not viable and he appeared to be developing systemic complications from myonecrosis, amputation of his right leg was deemed indicated.  A through-knee amputation of Colton

Read's right leg was then performed, and his left leg wounds were partially closed with silastic tapes and vacuum assisted dressing was applied.

      **16.**     Later on or about July 10, 2009, a through the knee amputation was performed on Airman Read's left leg and his right leg was further amputated to above the knee.   Over the next few weeks, Colton Read underwent major limb salvage surgeries to save part of his legs for prosthetics and he became a double above the knee amputee, with his right leg amputated through his thigh and his left leg amputated just above his knee, and he subsequently underwent multiple surgical revisions on his amputated legs.

**C.**    **TRANSFER OF AIRMAN READ TO THE CENTER FOR THE INTREPID**

      **17.**     On or about August 6, 2009, Colton Read was discharged from UCDMC and he was transferred to the Center for the Intrepid (CFI), located at the Brooke Army Medical Center (BAMC), Fort Sam Houston, Texas for rehabilitation and therapy due to his double amputation condition.   At the CFI and BAMC, Colton Read has received extensive medical and health care diagnosis care and treatment, including prosthetics and physical/occupational rehabilitation for his right and left leg amputation conditions, surgical treatment of hemorrhoids that developed from almost always being in a sitting position, implantation of a dorsal column stimulator, and eventual gallbladder removal surgery on or about February 9, 2010, and other medical health care and treatment.

## III. COUNT 1 - PLAINTIFFS CLAIM AGAINST DEFENDANT UNITED STATES UNDER THE FEDERAL TORT CLAIMS ACT

**A.**    **THE FEDERAL TORT CLAIMS ACT**

      **18.**     The Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346, 1402, 1504, 2110, 2401, 2402, 2411, 2412, 2671-2680[5] eliminated the total freedom from litigation the United States government had

---

[5] The Federal Tort Claims Act was enacted by Congress on August 2, 1946. *See Federal Tort Claims Act*, 60 Stat. 843 (1946). In 1948, the FTCA was repealed and re-enacted in its current form under the same FTCA name 28 U.S.C. §§ 1291, 1346 (b), 1402, 1504, 2110, 2401, 2402, 2411, 2412, and 2671-2680 when Title 28 of the United States Code was recodified.

long enjoyed under the common law doctrine of "sovereign immunity"[6] and abrogated "the federal government's tort immunity in sweeping terms."[7] Under the current FTCA, the statute broadly waives the federal government's immunity from tort suits, *see* 28 U.S.C. § 1346 (b) (2009), but reserves thirteen significant government activities where immunity is preserved. *See* 28 U.S.C. § 2680 (2009). The FTCA generally provides for the payment of money damages for persons or property injured as a result of the negligent actions of federal government officers or employees acting within the scope of their office or employment. *See* 28 U.S.C. § 1346 (b) (2009). Further, the FTCA provides that the federal government is liable "in the same manner and to the same extent as a private individual under like circumstances," *see* 28 U.S.C. § 2674 (2009), meaning that, if the same negligent conduct would subject a private person to liability, the federal government also would be liable. *See* 28 U.S.C. § 1346 (b) (2009).

19.     The FTCA, however, restricts a plaintiff-claimant's recovery in several ways. Claimants are initially required to submit an administrative claim to the appropriate federal governmental agency before filing a civil suit for damages. *See* 28 U.S.C. § 2675 (a). This FTCA remedy is generally exclusive, *see* 28 U.S.C. § 2679(b)(1); and the statute bars tort claims against the individual federal governmental

---

[6] For general background on the doctrine of sovereign immunity *See* Louis L. Jaffe, *Suits Against Governments and Officers: Sovereign Immunity,* 77 HARV. L. REV. 1, 1 (1963). The early U.S. Supreme Court rejected the Enlgish doctrine of sovereign immunity in *Chisholm v. Georgia,* 2 U.S. 419 (1793), by holding an individual could sue a state. In response, Congress adopted the Eleventh Amendment to the Constitution prohibiting suits against a state by cities of another state. *See* U.S. Const. Amend. XI. While the Eleventh Amendment precludes suits against a state, the Constitution is silent as to the United States immunity from suit. This issue was remedied in *Cohens v. Virginia,* 19 U.S. 264 (1821) where the U.S. Supreme Court ruled that the United States is immune from suit unless Congress consented to suit and waived sovereign immunity. *See* 19 U.S. 411-12. *See also* Jaffe, HARV. L. REV. 1, 20 (1963). Between 1821 and 1945, Congress enacted a series of statutes that provided limited tort remedies for individuals and, these laws gradually repudiated immunity to some extent. After July 28, 1945 the crash of a military aircraft into the Empire State Building, killing and injuring several people and causing about $1 million in damage, Congress passed the Federal Tort Claims Act ("FTCA") on August 2, 1946. *See* Lester S. Jayson & Robert C. Longstreth, *Handling Federal Tort Caims,* 2-6 (2006); Federal Tort Claims Act, 60 Stat. 843 (1946); *see also* http://en.wikipedia.org/wiki/B-25_Empire_State_Building_crash and http://www.npr.org/templates/story/story.php?storyId=92987873 (Last visited March 30, 2012); The FTCA of 1946 broadly waived the United States' sovereign immunity for torts and retroactively allowed the Empire State Building military aircraft crash victims to file suit for damages against the United States. *See* FTCA, 60 Stat. 843 § 410(a).

[7] *See* R. Matthew Molash, *Transition: If You Can't Save Us, Save Our Families: The Feres Doctrine and Servicemen's Kin, 1983* U. ILL. L. REV. 317, 319 (1983).

---

officer or employee who acted negligently in harming the claimant. *See* 28 U.S.C. § 2676. If the claimant is dissatisfied with the outcome of the administrative proceeding, the claimant may file a civil suit in federal court. *See* 28 U.S.C. 2675(a). A federal district court judge, rather than a jury, hears the plaintiff-claimant's case against the United States under the FTCA. *See* 28 U.S.C. § 2402. Moreover, the plaintiff-claimant is not allowed to recover punitive damages or prejudgment interest. *See* 28 U.S.C. § 2674. Venue is established in the judicial district in which the plaintiff-claimant resides or in which the negligent act or omission complained of occurred. *See* 28 U.S.C. § 1402(b). FTCA further provides that the substantive tort law or omission occurred controls issues of the United States' tort liability to the plaintiff-claimant. *See* 28 U.S.C. § 1346(b).

**B.      LIABILITY OF DEFENDANT UNITED STATES UNDER THE FTCA.**

      **20.**      On the occasion(s) in question in this civil action, the Defendant United States, by and through the United States Air Force ("USAF") and/or David Grant USAF Medical Center ("DGMC") and their/its officers or employees, Captain Kullada O. Pichakron, M.D. ("Dr. Pichakron"),[8] Captain Ryan J. Schutter, M.D. ("Dr. Schutter"),[9] Christopher Florentino, RN, K. Delk, RN, and other physicians and health care providers, who were acting in the course and scope of their offices or employment, each had a duty under applicable law to exercise ordinary and reasonable care and act as a reasonable and prudent general surgeon, first - year general surgery resident, physician, and/or health care provider, respectively, under the same or similar circumstances in their medical, surgical, nursing, or other health care diagnosis, assessment, care, and treatment of the Plaintiff Colton Read's gallbladder disorder, in the performance of the laparoscopic cholecystectomy procedure on Colton Read, the surgical assessment and repair of the

---

[8] Dr. Pichakron graduated from Boston University School of Medicine with a Medical Doctor (M.D.) degree, completed a five (5) year residency training program in general surgery, and had been practicing as a general surgeon for approximately four (4) years as of July-August 2009.

[9] Dr. Schutter graduated from Uniformed Services University of the Health Sciences medical school with a Medical Doctor (M.D.) degree in 2008 and he was in his first year of postgraduate training as a resident in the DGMC and University of California-Davis general surgery residency program as of July 9, 2009.

intraoperative aortic injury of Colton Read, and the postoperative injury(ies), illness(es), and/or condition(s) of Colton Read. Defendant United States, by and through the USAF and/or DGMC and their/its officers or employees, Dr. Pichakron, Dr. Schutter, Christopher Florentino, RN, K. Delk, RN, and other physicians and health care providers, breached these duties by engaging in one or more acts or omissions, singularly or in combination with others, constituting negligence and/or gross negligence, as follows:

   a.    In that Defendant United States, by and through the USAF and/or DGMC, failed to govern or supervise the quality of medical, surgical, nursing, and health care services to and for Plaintiff Colton Read's gallbladder disorder, and the laparoscopic cholecystectomy surgical procedure that was attempted to be performed as well as the assessment and management of the puncture, laceration, or injury to his abdominal aorta and the intraoperative and postoperative diagnosis, assessment, care, and treatment of his hemodynamic and vascular and neurological conditions, including without limitation such conditions of his aorta and lower extremities.

   b.    In that Defendant United States, by and through the USAF and/or DGMC, failed to timely, properly, and/or adequately formulate, adopt, and enforce appropriate policies, rules, and procedures necessary for the protection and safety of patients undergoing laparoscopic cholecystectomies that (1) required operating general surgeons to schedule and perform nonemergent laparoscopic cholecystectomies on patients only when one or more DGMC medical staff vascular surgeons was or were on stand-by or readily accessible to provide vascular surgical diagnosis, care, and treatment of serious vascular injuries or complications including injuries to the major blood vessels, including without limitation, the aorta; (2) required appropriate training and supervision for general surgery residents in training to perform various general surgical procedures, including laparoscopic cholecystectomies and avoidance or prevention of complications associated with such surgeries including injuries to the major blood vessels, including without limitation, the aorta; and (3) required operating surgeons to convert from laparoscopic cholecystectomies on a patient to open cholecystectomies or open exploratory laparotomies if there was or were problems that could not be solved readily and easily using the laparoscopic technique.

   c.    In that Defendant United States is vicariously liable to the Plaintiffs, Colton Read and Jessica Read for their injuries, harm, and damages, and/or aggravation of their injuries, harm, and damages because of the negligence and/or negligence of its officers or employees acting within the course and scope of their offices or employment in their medical, nursing and/or health care diagnosis, assessments, care, and treatment of Colton Read's illnesses, injuries and/or conditions as follows:

(1)  In that Dr. Pichakron negligently failed to timely, properly, and/or adequately supervise Dr. Schutter, a surgical resident in training, in performing the insertion of the trocar into the abdomen of Colton Read;

(2)  In that Dr. Schutter negligently failed to perform the insertion of the trocar into the abdomen of Colton Read in a timely, proper, and adequate manner;

(3)  In that Dr. Schutter negligently failed to perform the insertion of the trocar into the abdomen of Colton Read in a timely, proper, and adequate manner to avoid the puncture, laceration, or injury to Airman Read's abdominal aorta;

(4)  In that Dr. Schutter negligently inserted the trocar into the abdomen of Colton Read in an untimely, improper, and/or inadequate manner which resulted in the puncture, laceration, and/or injury to Airman Read's abdominal aorta;

(5)  In that Dr. Schutter negligently failed to recognize, detect, assess, and report his probable or potential puncture, laceration, or injury to Colton Read's abdominal aorta with a trocar in a timely, proper, and/or adequate manner;

(6)  In that Dr. Pichakron negligently failed to recognize, detect, and/or assess the source of the bleeding from the trocar induced puncture, laceration, or injury to Colton Read's abdominal aorta in a timely, proper, and/or adequate manner;

(7)  In that Dr. Pichakron negligently failed to seek and obtain a consultation with a vascular surgeon specialist concerning the diagnosis, care, and treatment of the puncture, laceration, or injury to Colton Read's abdominal aorta in a timely, proper and/or adequate manner when she knew, or reasonably should have known, that the services of a vascular surgeon specialist were indicated for the diagnosis, care, and treatment of Colton Read's abdominal aortic puncture, laceration, or injury;

(8)  In that Dr. Pichakron negligently failed to surgically repair the puncture, laceration, or injury to Colton Read's abdominal aorta in a timely, proper, and/or adequate manner;

(9)  In that Dr. Pichakron negligently performed an attempted repair of the puncture, laceration, or injury to Colton Read's abdominal aorta in a manner which resulted in a loss or reduction of adequate blood supply to his right and left legs;

(10)  In that Dr. Pichakron negligently failed to diagnose and/or assess the loss or reduction of blood supply to Colton Read's right and left legs after her attempted surgical repair of the puncture, laceration, or injury to his

abdominal aorta during and after the completion of the open exploratory laparotomy surgery on Airman Read;

(11)   In that Dr. Schutter negligently failed to timely, properly, and/or adequately assist in the diagnosis and/or assessment of the loss or reduction of blood supply to Colton Read's right and left legs after Dr. Pichakron's attempted surgical repair of the puncture, laceration, or injury to his abdominal aorta during and after the completion of the open exploratory laparotomy surgery on Airman Read, and failed to timely, properly, and/or adequately report an assessment of the loss of blood supply to Colton Read's right and left legs during and after such surgery;

(12)   In that one or more members of the operating and/or anesthesia team failed to assess and report the loss or reduction of blood supply to Colton Read's right and left legs during and/or after the completion of the open exploratory laparotomy surgery on Airman Read;

(13)   In that Dr. Pichakron and other physicians negligently failed to diagnose and assess the loss or reduction of blood supply to Colton Read's right and left legs in a timely, proper, and/or adequate manner;

(14)   In that Dr. Pichakron negligently failed to order or bring about the performance of appropriate interventional radiology studies or tests or other medical studies or tests to determine or assess the vascular and neurological conditions of Colton Read's lower extremities, including without limitation the loss or significant reduction of blood supply and or ischemia to his lower extremities, and the neurological signs and symptoms of such conditions, in a timely, proper, and/or adequate manner;

(15)   In that one or more other USAF physicians negligently failed to order, recommend, or bring about the performance of appropriate interventional radiology studies or tests or other medical studies or tests to determine or assess the vascular and neurological conditions of Colton Read's lower extremities, including without limitation the loss or significant reduction of blood supply and or ischemia to his lower extremities, and the neurological signs and symptoms of such conditions, in a timely, proper, and adequate manner;

(16)   In that Dr. Eskew and/or other physician radiologists negligently failed to perform, interpret, and/or report the radiology and/or interventional radiology studies performed on Colton Read in a timely, proper, and adequate manner;

(17)   In that Dr. Pichakron and/or one or more other USAF/DGMC medical staff and/or consulting physicians negligently failed to diagnose, assess, recognize and/or become concerned or sufficiently concerned about the

loss or reduction of blood flow to Colton Read's lower extremities in a timely, proper, and/or adequate manner;

(18)     In that Dr. Pichakron and/or Dr. Schutter and/or one or more other USAF/DGMC medical staff and/or consulting physicians negligently failed to establish blood flow and/or sufficient blood flow to Colton Read's lower extremities after he sustained a puncture, laceration, or injury to his abdominal aorta in a timely, proper, and/or adequate manner;

(19)     In that Dr. Pichakron and/or one or more other USAF/DGMC medical staff and/or consulting physicians negligently failed to seek and obtain a consultation with a vascular surgeon specialist concerning Colton Read's postoperative ischemic lower extremities conditions and/or refer and

         transfer Airman Read to a vascular surgeon specialist for diagnosis, assessment, care, and treatment of his ischemic lower extremities conditions in a timely, proper, and/or adequate manner;

(20)     In that Dr. Pichakron, the CT surgeon, and/or other USAF/DGMC medical staff and/or consulting physicians negligently failed to decide to transfer and bring about the transfer of Colton Read to UCDMC for vascular surgical diagnosis, care, and treatment of the cause or causes of his ischemic lower extremities in a timely, proper, and/or adequate manner;

(21)     In that Dr. Pichakron negligently failed to assess the need for transferring Colton Read to UCDMC and/or other appropriate medical center or hospital with medical staff vascular surgeons for vascular surgical diagnosis, care, and treatment of the cause or causes of his ischemic lower extremities in a timely, proper, and/or adequate manner and failing to bring about such transfer of Airman Read to UCDMC in a timely, proper, and/or adequate manner;

(22)     In that Dr. Pichakron and/or other USAF and/or DGMC physician and/or health care provider officers or employees negligently failed to transfer and/or bring about the transfer of Colton Read to UCDMC and/or another appropriate medical center or hospital with medical staff vascular surgeons for vascular surgical diagnosis, care, and treatment of his ischemic and limbs threatening lower extremities conditions in a timely, proper, and/or adequate manner; and

(23)     In that Christopher Florentino, RN, K. Delk, R.N., and/or other ICU nurses negligently failed to assess Colton Read's lower extremities ischemia and limbs threatening conditions and advocate for their patient, Airman Read, for Dr. Pichakron to consult with and transfer him to UCDMC and/or another appropriate medical center or hospital with medical staff vascular surgeons for vascular surgical diagnosis, care, and treatment of his ischemic and limbs threatening lower extremities

conditions in a timely, proper, and/or adequate manner, and in negligently failing to use the DGMC nursing chain of command to bring about an appropriate medical evaluation of Airman Read's ischemic and limbs threatening lower extremities conditions and transfer to UCDMC or another appropriate medical center or hospital with medical staff vascular surgeons for vascular surgical diagnosis, care, and treatment of his ischemic and limbs threatening lower extremities conditions in a timely, proper, and/or adequate manner.

21.    Defendant United States', by and through the USAF and/or DGMC, breach of the above-described legal duty or duties proximately caused the occurrence or incident, injuries, harm, and/or aggravation of injuries or conditions of Plaintiff Colton Read which resulted in the injuries, harm, and damages, and/or aggravation of injuries, harm, and damages of Plaintiff Colton Read as set forth below with more specificity in Paragraph V, A of this Complaint.

22.    Defendant United States', by and through the USAF and/or DGMC, breach of the above-described legal duty or duties proximately caused the occurrence or incident, injuries, harm, and/or aggravation of injuries or conditions of Plaintiff Colton Read and/or Jessica Read which resulted in the injuries, harm, and damages, and/or aggravation of injuries, harm, and damages of Plaintiff Jessica Read as set forth below with more specificity in Paragraph V, B of this Complaint.

23.    Under the laws of the State of California, a private person would be liable to the Plaintiffs Colton Read and Jessica Read for the above-described negligence and/or gross negligence of the Defendant United States, by and through the USAF and/or the DGMC and their/its officers or employees Dr. Pichakron, Dr. Schutter, Christopher Florentino, RN, K. Delk, RN, and other physicians and health care providers. Under the FTCA, 28 U.S.C. § 2674, the Defendant United States is liable to the Plaintiffs Colton Read and Jessica Read for their damages resulting from the injuries and/or aggravation of injuries described above and below in Paragraph V, A and B of this Complaint.

**C.    THE *"FERES* DOCTRINE" IS NEITHER APPLICABLE NOR ENFORCEABLE SINCE IT WAS NOT A PROVISION UNDER THE FTCA AND HAS NO BASIS IN THE LANGUAGE AND LEGISLATIVE HISTORY OF THE FTCA**

 **24**. Plaintiffs Colton Read and Jessica Read assert that the judicial expansion and broadening of the Foreign Combatant Exception, also referred to as the "incident to military service exception" of the FTCA to encompass all injuries sustained by military personnel "where the injuries arise out of or are in the course of activity incident to service" in *Feres v. United States,* 340 U.S. 135, 146 (1950), and its progeny, also referred to as the *"Feres* Doctrine, was not a legislative provision under the FTCA and has no foundation in the language and legislative history of the FTCA, and therefore, the *Feres* doctrine is not entitled to any application or enforcement by this or any other Court. This assertion by the Plaintiffs is a nonfrivolous argument for modifying or reversing existing law or establishing new law.

**D.    PLAINTIFFS CONSTITUTIONAL CHALLENGES TO THE FTCA'S JUDICIALLY IMPOSED *"FERES* DOCTRINE"**

 **25**. Plaintiffs Colton Read and Jessica Read assert that the judicial expansion and broadening of the Foreign Combatant Exception,[10] also referred to as the "incident to military service exception," of the FTCA to encompass all injuries sustained by military personnel "where the injuries arise out of or are in the course of activity incident to service" in *Feres v. United States,* 340 U.S. 135, 146 (1950), and its progeny also referred to as the *"Feres* doctrine," violates the Plaintiffs Colton Read and Jessica Read's rights under the United States Constitution, including the separation of powers, equal protection and the due process clause for the following reasons:

   **a.** For the reasons set forth in the dissenting opinion by Judge Warren J. Ferguson in *Costo v. United States,* 248 F.3d 863, 869-70 (9th Cir. 2001) (Ferguson, J., dissenting);

---

[10] *See* 28 U.S.C. § 2680(j) (2009). (Prohibiting recovery for "any claim arising out of the combatant activities of the military or naval forces, or the Coast Guard, during time of war.").

    **b.**    For the reasons set forth in the dissenting opinion by Justice Scalia criticizing the rational for the *Feres* doctrine in *Johnson v. United States,* 481 U.S. 681, 688-700 (1987) (Scalia, J., dissenting);

    **c.**    For the reasons set forth in the dissenting opinion by Chief Justice Becker in *O'Neil v. United States,* 140 F.3d 564, 565 (3d Cir. 1998) (Becker, C.J., dissenting)(recognizing widespread criticism of the *Feres* doctrine and "urg[ing] the Supreme Court to grant *certiorari* and reconsider *Feres*");

    **d.**    For the reasons set forth in *Johnson v. United States,* 749 F.2d 1530, 1532-35 (11th Cir. 1983)(reviewing history and development of *Feres* doctrine, and noting "widespread, almost universal criticism" of the doctrine); and *Johnson v. United States,* 704 F.2d 1431, 1435 (9th Cir. 1983)(original rational for *Feres* doctrine has been undercut and abandoned);

    **e.**    For the reason that the *Feres* doctrine creates two different classes, composed of active duty military service personnel and civilians, who are disporately treated despite the fact that they are similarly situated with respect to the FTCA and the intent of Congress.

    **26.**    These assertions by Plaintiffs Colton Read and Jessica Read are nonfrivolous arguments for modifying or reversing existing law or establishing new law.

**E.**    **ALTERNATIVE ASSERTION FOR THE COURT TO ADOPT THE DISCRETIONARY FUNCTION EXCEPTION AS AN ALTERNATIVE TO THE "*FERES* DOCTRINE" UNDER THE FTCA**

    **27.**    Alternatively, without waiver of the foregoing, Plaintiffs Colton Read and Jessica Read assert that the Court should apply the Discretionary Function Exception of the FTCA [11] to their above-described medical malpractice claim against the Defendant United States, in lieu of the *Feres* doctrine, for the following reasons:

    **a.**    The discretionary function exception to the FTCA, instead of the *Feres* doctrine, provides a fair balance between the Plaintiff Colton Read and Jessica Read's/tort victim recovery and federal governmental immunity in medical malpractice cases;

    **b.**    Military discipline is not adversely affected when a military service member and his/her spouse, including the Plaintiffs Colton Read and Jessica Read, recovers from the federal government after a United States military physician negligently

---

[11] *See* 28 U.S.C. § 2680(a) (2009) ("any claim...)

caused an injury to the military service member, including the Plaintiff Colton Read;

    c.      Since the discretionary function exception to the FTCA and the *Feres* doctrine attempt to protect a unique relationship between the federal government and its officers or employees, the federal government actually needs only one test to establish governmental immunity in medical malpractice cases, including the Plaintiffs' above-described medical malpractice claim against the United States; and the discretionary function exception to the FTCA is a fairer approach than the *Feres* doctrine for establishing governmental immunity in medical malpractice cases, including the Plaintiffs above-described medical malpractice claim, and should be the only test applied in military service member and civilian claims alike.

## IV. COUNT 2 - PLAINTIFFS CLAIM AGAINST DEFENDANT UNITED STATES FOR DECLARATORY RELIEF AS TO THE FEDERAL TORT CLAIMS ACT

    28.    Plaintiffs Colton Read and Jessica Read realledge and incorporate herein by reference as though fully set forth, each and every allegation contained in Paragraphs 1 through 27 of this Complaint.

    29.    Recognizing that the Court may believe it is bound to uphold the *Feres* doctrine as a matter of *stare decisis*, the Plaintiffs Colton Read and Jessica Read nevertheless seek a declaration from the Court that the *Feres* doctrine is unconstitutional for the reasons set forth with more specificity in Paragraphs 25 and 26 of this Complaint.

    30.    This claim by the Plaintiffs Colton Read and Jessica Read for declaratory relief is a nonfrivolous argument for modifying or reversing existing law or establishing new law.

## V. PLAINTIFFS CLAIM FOR DAMAGES AND ATTORNEY FEES

### A. ACTUAL DAMAGES OF PLAINTIFF COLTON READ

    31.    As a proximate cause of the Defendant United States negligence, gross negligence, and other wrongful conduct, as set forth in Paragraphs III, 20 through 23 of this Complaint, the Plaintiff Colton Read has suffered and is entitled to recover fair and reasonable compensation for the below-listed and described injuries, damages, and/or aggravation of injuries and damages, as follows:

a.  Physical pain and mental anguish sustained by Colton Read in the past in a fair and reasonable amount of at least $4,000,000.00;

b.  Physical pain and mental anguish that, in reasonable probability, Colton Read will sustain in the future in the fair and reasonable amount of at least $7,000,000.00;

c.  Loss of earning capacity and/or earnings of Colton Read sustained in the past in the fair and reasonable amount of at least $300,000.00;

d.  Loss of earning capacity and/or earnings that, in reasonable probability, Colton Read will sustain in the future in the fair and reasonable amount of at least $3,000,000.00;

e.  Disfigurement sustained by Colton Read in the past in the fair and reasonable amount of at least $2,000,000.00;

f.  Disfigurement that, in reasonable probability, Colton Read will sustain in the future in the fair and reasonable amount of at least $4,000,000.00;

g.  Physical impairment sustained by Colton Read in the past in the fair and reasonable amount of at least $2,000,000.00;

h.  Physical impairment that, in reasonable probability, Colton Read will sustain in the future in the fair and reasonable amount of at least $400,000,000.00;

i.  The reasonable value of necessary medical and health care services, products, and/or goods to and/or for Colton Read, in the past, resulting from his injuries caused by the occurrence(s) and/or incident(s) made the basis of this civil action in the fair and reasonable amount of at least $66,442.28;

j.  The reasonable value of necessary medical and health care services, products, and/or goods that, in reasonable probability, will be necessary for Colton Read in the future, resulting from his injuries caused by the occurrence(s) and/or incident(s) made the basis of this civil action in the fair and reasonable amount of at least $2,000,000.00;

k.  Loss of enjoyment of life or loss of capacity to enjoy life sustained by Colton Read in the past in a fair and reasonable amount of at least $2,000,000.00;

l.  Loss of enjoyment of life or loss of capacity to enjoy life that, in reasonable probability, will be sustained by Colton Read in the future in a fair and reasonable amount of at least $4,000,000.00;

m.  All other actual, consequential, and/or special damages allowed by law sustained by Colton Read in the past in a fair and reasonable amount; and

     **n.**    All other actual, consequential, and/or special damages allowed by law that, in reasonable probability, Colton Read will sustain in the future in a fair and reasonable amount.

**B.**   **ACTUAL DAMAGES OF PLAINTIFF JESSICA READ**

     **32.**   As a proximate cause of the Defendant United States negligence, gross negligence, and other wrongful conduct, as set forth in Paragraphs III, 20 through 23 of this Complaint, the Plaintiff Jessica Read has suffered and is entitled to recover fair and reasonable compensation for the below-listed and described injuries, damages, and/or aggravation of injuries and damages, as follows:

     **a.**    Loss of household services of Colton Read sustained by Jessica Read in the past in a fair and reasonable amount of at least $500,000.00;

     **b.**    Loss of household services of Colton Read that, in reasonable probability, Jessica Read will sustain in the future in a fair and reasonable amount of at least $2,000,000.00;

     **c.**    Loss of consortium with Colton Read sustained by Jessica Read in the past in a fair and reasonable amount of at least $3,000,000.00;

     **d.**    Loss of consortium with Colton Read that, in reasonable probability, Jessica Read will sustain in the future in a fair and reasonable amount of at least $5,000,000.00;

     **e.**    Loss of enjoyment of life or loss of capacity to enjoy life sustained by Jessica Read in the past in a fair and reasonable amount of $1,000,000.00;

     **f.**    Loss of enjoyment of life or loss of capacity to enjoy life that, in reasonable probability, will be sustained by Jessica Read in the future in a fair and reasonable amount of at least $4,000,000.00;

     **g.**    Mental anguish of Jessica Read sustained in the past due to depression, severe anxiety, panic attacks, nightmares and abnormal fertility process in a fair and reasonable amount of $1,000,000.00;

     **h.**    Mental anguish that, in reasonable probability, Jessica Read will sustain in the future due to depression, severe anxiety, panic attacks, nightmares and abnormal fertility process in a fair and reasonable amount of $4,000,000.00;

     **i.**    All other actual, consequential, and/or special damages allowed by applicable law sustained by Jessica Read in the past in a fair and reasonable amount; and

     **j.**    All other actual, consequential, and/or special damages allowed by applicable law that, in reasonable probability, Jessica Read will sustain in the future in a fair and reasonable amount.

C.  **ATTORNEY FEES, COSTS, AND/OR EXPENSES**

**33.** Plaintiffs Colton Read and Jessica Read are entitled to recover an award of reasonable attorney fees, costs, and/or expenses under 28 U.S.C. § 2412 and other applicable law.

## VI. PRAYER

**34. FOR THESE REASONS**, the Plaintiffs Colton J. Read and Jessica G. Read, pray that the Defendant United States of America be cited and summoned to appear and answer herein, that the Court set this case for a nonjury trial, and, on final trial or other applicable final judicial proceeding, that Plaintiffs Colton and Jessica Read have judgment in their favor and against the Defendant United States of America for the following:

a.  That Plaintiff Colton Read recover judgment from Defendant United States for his above-described actual economic and noneconomic damages in a fair and reasonable amount of at least $34,366,442.28;

b.  That Plaintiff Jessica Read recover judgment from Defendant United States for her above-described actual economic and noneconomic damages in a fair and reasonable amount of at least $20,500,000.00;

c.  That Plaintiffs Colton Read and Jessica Read recover on their Count 2 cause of action for declaratory relief as to the Federal Tort Claims Act in favor of the Plaintiffs as requested and for the above-stated reasons;

d.  That Plaintiffs Colton Read and Jessica Read recover reasonable attorney fees, costs, and/or expenses incurred in this civil action pursuant to 28 U.S.C. § 2412 and any other applicable law;

e.  That Plaintiffs Colton Read and Jessica Read recover postjudgment interest as allowed by 28 U.S.C. § 2674 and/or other applicable law;

f.  That Plaintiffs Colton Read and Jessica Read recover their taxable costs of court as allowed by applicable law;

g.  That Plaintiffs Colton Read and Jessica Read recover such other relief as the Court deems just and proper.

*COLTON JAMES READ, ET AL VS. UNITED STATES OF AMERICA*

**Dated: March 30, 2012.**

**RESPECTFULLY SUBMITTED,**

**DARRELL L. KEITH**
**State Bar of Texas No. 11186000**

**KEITH LAW FIRM, P. C.**
**1705 West Seventh Street**
**Fort Worth, Texas 76102**
| | |
|---|---|
| **Telephone:** | **(817) 338-1400** |
| **Metro:** | **(817) 429-9100** |
| **Toll Free:** | **(877) 560-1400** |
| **Telefax:** | **(817) 870-2448** |
| **Email:** | **dk@keithlaw.com** |

**ATTORNEYS FOR PLAINTIFFS COLTON J.**
**READ AND JESSICA G. READ**

JS 44 (TXND Rev. 2/10)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
Colton J. Read and Jessica G. Read

**DEFENDANTS**
United States of America

4 12CV- 191A

**(b)** County of Residence of First Listed Plaintiff    Tarrant
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

RECEIVED
MAR 30 2012
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Darrell L. Keith, Keith Law Firm, P.C., 1705 W. Seventh St., Fort Worth,
Texas 76102, telephone number (817) 338-1400

Attorneys (If Known)
Hildegarde Conte Perlstein, Chief, Medical Law Branch, Claims and
Tort Litigation Division, HG AFLOA/JACC, 1500 W. Perimeter Rd.,
Suite 1700, Joint Base Andrews MD  20762

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government
Plaintiff

☐ 3  Federal Question
(U.S. Government Not a Party)

☒ 2  U.S. Government
Defendant

☐ 4  Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                                  and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☒ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | Liability | | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1  Original
Proceeding

☐ 2  Removed from
State Court

☐ 3  Remanded from
Appellate Court

☐ 4  Reinstated or
Reopened

☐ 5  Transferred from
another district
(specify)

☐ 6  Multidistrict
Litigation

☐ 7  Appeal to District
Judge from
Magistrate
Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
Federal Tort Claims Act (FTCA) secs. 1346, 2671-2680

Brief description of cause:
Medical malpractice action against the United States under FTCA

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $
54,866,442.28

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) (See instructions)
PENDING OR CLOSED:

JUDGE

DOCKET NUMBER

DATE
03-30-2012

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____